| 12 | 557 |
| 29 | 43 |
| 29 | 320 |
| 12 | 557 |
| 33 | 102 |

## CLIFTON ELLISON *v.* THE STATE.

1. CHANGE OF VENUE — PRACTICE.— Application of defendant for a change of venue being overruled, he reserved exceptions and then applied for and obtained a continuance. Being convicted at a subsequent term, he appeals and assigns error in the refusal of the trial court to change the venue at the previous term. *Held*, that, even if that action was erroneous, the error is not such as affects a conviction had at a subsequent term, when there may have existed none of the causes assigned in the application for a change of the venue. If cause for a change of venue existed at the term when the trial and conviction were had, an application based on such cause should have been then made.

2. JURY LAW — CHALLENGE FOR BIAS.— In a murder case a juror stated on his *voir dire* that from what he had heard he had formed an impression respecting the guilt or innocence of the defendant, but that he had not heard the evidence nor talked with any of the witnesses,— that if the evidence should prove what he had heard, then he had an opinion, but that he did not know whether what he had heard was true, and had formed no conclusion that it was true. *Held*, that these statements do not show that, from hearsay or otherwise, there was established in the juror's mind such a conclusion as would influence his verdict, and the trial court did not err in holding him competent.

3. OATH TO JURY — PRACTICE.— In the trial of a capital case the juror's oath is to be administered to each juror as he is selected. In cases less than capital the oath is to be administered to the jury *en masse.*

4. JURY LAW.— After a juror has been impaneled and sworn in a felony case the court is not authorized to excuse him and cause another to

be sworn in his place.   If sickness or other cause renders it imprac-
ticable to proceed with the jury as impaneled, that jury should be
discharged, and another jury be organized.

5. Same — Case Stated.— In a trial for murder eleven jurors had been
selected and sworn when the court announced that one of them was
unwell, and would be discharged if the parties would consent
thereto.   The State consented but the defense stood mute, and
thereupon the court discharged the juror and proceeded to fill the
panel.   The defense reserved exceptions to the discharge of the
juror and to every subsequent step involving the question.   Held,
that the action of the court was without authority of law.

6. Murder — Evidence.— In a trial for murder wherein the evidence
showed a mutual combat between the defendant and the deceased
wherein the former killed the latter with a pistol, the State was
allowed to prove statements made by the deceased, prior to the con-
flict, to the effect that he had no weapon.   The defense proposed to
rebut those statements by proof of contradictory statements made
by the deceased about the same time; but the court, on objection
· by the State, excluded the proposed proof as hearsay and irrelevant.
Held, in view of the scope allowed the State, that the rebutting
proof offered by the defense should have been admitted.

7. Charge of the Court.— Being convicted of murder in the second
degree the appellant assigns as error an instruction that "the law
implies malice from every voluntary killing of a human being
where the facts and circumstances do not show upon the one hand
express malice, nor, upon the other, any justification or excuse."
Held, incorrect because a voluntary homicide, though not upon ex-
press malice nor justifiable or excusable, might be manslaughter or
negligent homicide, and not upon implied malice.

8. Same — Manslaughter.— Note in a trial for murder a state of proof
which required that the court should have given in charge to the
jury the second of the "adequate causes" defined by article 597 of
the Penal Code,— viz.: "A serious personal conflict, in which great
injury is inflicted by the person killed by means of weapons or
other instruments of violence, or by means of great superiority of
personal strength, although the person guilty of the homicide were
the aggressor, provided such aggression was not made with intent
to bring on a conflict and for the purpose of killing."

Appeal from the District Court of Caldwell.   Tried
below before the Hon. L. W. Moore.

The indictment was presented September 28, 1880, and
charged that Clifton Ellison, the appellant, on June 11,

1880, did, of express malice aforethought, shoot and kill Robert Dickerson. At the same term of court the defense filed an application for a change of the venue, alleging that by reason of prejudice and an influential combination against the defendant he could not obtain a fair trial in Caldwell county. The State resisted the application and it was overruled; to which the defense excepted. Thereupon the defense applied for and obtained a continuance of the cause. In October, 1881, a trial was had, resulting in the defendant's conviction for murder in the second degree and the assessment of his punishment at a term of twenty years in the penitentiary.

The evidence is elaborate and was elicited from many witnesses, and on some of the most important details of the homicide there was conflict between the testimony for the State and that for the defense. It appears that Robert Dickerson, the deceased, was a young man, but older than the defendant, and that they were cousins. Indistinct mention is made in the testimony of a difficulty between them a few hours before the encounter in which the defendant killed Dickerson by shooting him with a pistol.

N. Hale was the first witness introduced by the State. He testified that the killing occurred about daylight and on a road leading from Rogers's Springs in Caldwell county. The night previous to the killing the defendant, the deceased, the witness and many other persons attended a dancing party or ball at Rogers's Springs, and the fatal difficulty between the defendant and the deceased took place when they were on their return from the ball. The ball broke up about daylight, the crowd dispersing in a body and about the same time. A large number started off by way of a neighboring bridge, which was near the scene of the homicide. The witness was among the last of the party to approach the bridge. Within ten feet beyond the bridge, the road forked, lead-

ing in different directions. When the witness reached this fork, he saw the defendant and the deceased together, with a crowd about them. The deceased was the first one to speak. He said to the defendant: "You treated me bad last night,—like a dog," and asked him, "What are you going to do about it?" The defendant replied: "If you don't like it you can get more of it." The parties and some others of the crowd got down from their horses, and something was said about the difficulty of the night previous. The deceased asked, "How do you want to fight?" The defendant answered, "Any way." The general understanding seemed to be that they were going to engage in a fist fight. The deceased pulled off his coat, hat and vest, and suggested to the defendant to do the same, but the latter declined, saying that he would "not do it for any man.". The witness saw no arms of any kind about the person of the deceased. The two ran together, and at that time the witness dismounted. They fought around a circle of 30 or 40 feet, the defendant rather fighting and backing. The witness ran to them as quick as he could and grasped both. They appeared then to have quit striking and to have got to scuffling over something. This continued for a short space of time, when a pistol was discharged by the defendant, which penetrated the side of the deceased, and went through the body, bringing him to his knees. The next shot struck him in the neck. Four shots in all were fired. Death ensued in about two minutes.

The witness did not know until it was fired that the defendant had a pistol. When the pistol was first discharged the deceased exclaimed "Oh! Cliff, you have shot me." The witness did not remember what were the exact words used by the defendant after the shooting, but they were in substance "boys, I have killed him,— here he is." The witness did not see W. J. Ellison until after the killing. W. J. Ellison was on the other side of the

bridge at that time, but came up shortly afterwards. The defendant remained on the ground but a few minutes after the killing. He rode off towards Lockhart. When the witness had hold of the parties, the deceased had no weapon in his hand, and if he had used anything in striking the defendant, the witness thought he would have seen it. The witness saw the deceased laid out, and assisted in dressing him. No arms of any kind, other than a small pocket knife, were found on his person. The witness did not hear the deceased, during the encounter or at any time, threaten to break a pistol over the defendant's head. He at no time saw blood about the defendant. After the fight he heard the defendant say something about being cut, and saw him show his wound to Bill Ellison.

The cross-examination of this witness was rigid and searching, but, farther than eliciting a somewhat more detailed account of the occurrences at the time of the killing, it wrought no appreciable change in the substance of his testimony as given in his examination in chief. He stated, however, that after the killing a pistol other than that used by the defendant was found on the ground.

Jack Gatlin testified for the State that he was present at the difficulty which culminated in the homicide. His account of the occurrences at that time did not materially vary from the account given by Hale, the first witness. He testified to exceptional opportunities, on the night before the killing at the ball, of observing whether or not the deceased had a pistol about his person, and he saw none. He stated, further, that as the two combatants were preparing to engage in the fight the defendant addressed the crowd and said that he would kill the first man who attempted to interfere. The pistol picked up was not found on the immediate ground over which the parties fought.

John Galbreath, witness for the State, gave a similar

account of the occurrences at the time of the homicide.
He stated that when the deceased addressed the defend-
ant with reference to the first difficulty he said: "You
beat me up like a dog. . . . I don't like for a man to
take advantage of me, and beat me up that way. . . .
I am not satisfied;" whereupon the parties agreed to fight
a fist fight, and engaged in the fight which resulted in
the homicide.   This witness stated that, as soon as the
killing occurred, the defendant rode off, exclaiming
"whoop-ee, ain't I a good one.   Boys, I have killed him;
here he is, come and look at him!"

Sam Carter testified for the State that he was camped
near the scene of the fatal encounter, and saw it all.  His
account of it in every material respect coincided with that
of the previous witness.   He stated, however, that after
the killing the defendant exclaimed "boys, I have killed
him, but he come at me with a pistol."

The substance of the testimony of John Blewitt, wit-
ness for the State, was that in company with the defend-
ant he was the first to leave the ball room.   After they
had crossed the bridge and reached the forks of the road,
the defendant stopped and said that he would wait for the
crowd.   The deceased rode up and said "Cliff, you beat
and banged me up like h—ll last night."   The defendant
replied: "If you are not satisfied I can give you more."
The deceased said in reply: "Suppose I don't want to
fight?"   The defendant answered: "If you don't want
to fight, call out your friends," and the deceased responded:
"I don't allow my friends to fight for me."   The defend-
ant then said: "I am change for you and your friends."
The deceased then said: "If nothing but a fight will do
you, I will fight you a fair fist fight."   The parties dis-
mounted, and the deceased, repeating that the defendant
had treated him like a d—d dog, slapped the defendant on
the breast.   The defendant thereupon drew his pistol,
raised it over his head as if to strike, and the witness dis-

tinctly heard it click twice. The deceased said: "I will show you how to strike me over the head with a pistol." The defendant said: "I will show you I am some punks," and fired. Four shots were fired. As the defendant rode off he said "By G—d, ain't I a good one ?"

Joe Dillard testified in substance, for the defense, that before the first difficulty at Rogers's Springs and during the ball, the deceased sat down in his lap, and while he had his arms around him, he felt something in the waist-band of his pants which felt like a large pistol. He did not see it,— merely felt it.

W. J. Ellison, a half-nephew of the defendant, testified, in substance, that at the ball he heard of a difficulty between the defendant and deceased, and by request, as a friend to both, went out to see the deceased. The two walked off together, the witness on the left side of the deceased. The witness felt a pistol on the person of the deceased and had his hand on it. He asked the deceased to give up his arms. While they were talking, Bruce, the constable, approached and told the deceased that he wanted to see him. The two walked off, and when they returned the witness and deceased walked together to a well and sat down. The witness placed his hand on the pistol again, and asked him to give it up, and he declined. Hale, Gatlin, McFarland and others came up and proposed that deceased should pick his best friend, who with the witness would search and disarm the defendant, and then return and search and disarm the deceased; after which the defendant and deceased should get together and settle their difficulty. The deceased replied that he would not give up a d—d thing, but would have satisfaction that night. The defendant told the witness to go to see the deceased, and the witness so informed the deceased. The defendant was disarmed that night by some one. George Lincecum brought the defendant's pistol to the witness, and the witness told the

deceased that the defendant had been disarmed. The witness deposited the pistol with Rogers. A short time before daylight, and as the defendant was preparing to go home, the witness got and gave him his pistol.

The witness was on the opposite side of the bridge when the shooting took place. The defendant called to him to come up, saying that he had killed the deceased, and had to do it in self-defense. The defendant had been struck on the back of the head, from which wound blood was dripping. The wound was between a half and three-quarters of an inch in length. Before he left, the defendant told the witness that he had killed the deceased in self-defense, and asked the witness what to do. The witness asked him what he wanted to do. He replied that he wanted to surrender, and the witness advised him not to until he could see his father. The defendant at no time made such a remark as "Whoop-ee, I am a good one." He did not say "Come up, boys, and look at him." The witness saw the pistol which was picked up on the ground. John Rogers, who was standing some five or six steps from the body, had it in his hand. The witness took it and handed it to Byrd Rogers, requesting him to keep it and hand it in at the inquest. When the witness next saw the defendant he was at Harrison's gin. He had fresh blood over his head and neck. He had no blood about him at the ball, or before the killing, that the witness saw.

Tom Poston testified for the defense that he was one of the crowd at the place of the shooting. He saw two men ahead of him in the act of separating at the forks of the road, and heard some words pass between them which he could not distinguish. They dismounted and one man pulled off his coat and hat. This man proved to be the deceased. He struck the defendant the first lick and the fight commenced. The deceased got the defendant's head down, and was striking him with what witness took to

be a pistol. The instrument made a rattling noise like the loose ramrod of a pistol. The witness saw something in the hands of the deceased while he was striking. While the fight was going on the defendant fired, shooting the deceased through the side. This witness thought that the deceased fell at the last shot, at which time several persons tried to separate the parties.

After the shooting, the defendant remarked that his head was cut and that it was painful. He showed the wound to the witness. The defendant walked up near the body and said that he had killed the deceased, but that he had to do it in order to keep the deceased from killing him. He did not call upon the boys to come up and look at the body. He did not whoop and say: "Ain't I a good one?" This witness and others went to Bill Ellison's to breakfast, and the witness there examined the wound on the defendant's head. It was a tolerably deep gash on the back of his head, and was the same that the witness saw at the place of the killing.

Joe and John O'Banion and Ike Crenshaw, others of the party, corroborated the last witness in every respect, none of them varying in any appreciable degree. Each of them believed that the deceased used a pistol in striking the defendant, and each declared the licks too loud to have been struck with the fist. Each examined the wound on the defendant's head, and testified that he had no traces of blood about him before the killing, and each denied that the defendant made the remarks after the killing imputed to him by the prosecution.

Joe Lister testified that he was one of the party present at the killing, and was nearer the deceased and the defendant by about four yards than any other person. He arrived on the ground after one had dismounted and just as the other was in the act of dismounting. The deceased pulled off his coat, and, as he turned to hang it on his saddle, the witness saw a pistol sticking in his

pants on his left side. The witness saw the pistol plainly. The deceased seemed to want to hide it, and with his hand pushed it farther into his pants, concealing part of the cylinder. The witness did not see him draw his pistol during the fight, but saw that the deceased got the defendant's head bent down, and was striking him with something he thought was a pistol. The licks were too loud to have been inflicted with the fist. His account of the fight is otherwise substantially the same as that of Poston, the O'Banions and Crenshaw. This witness, however, testified that he saw Rogers pick up a pistol about three feet from the body, nearest the head, after the shooting. The defendant had taken his pistol off with him, and that found on the ground was not the defendant's pistol. The witness said to Jack Gatlin, just after the shooting, that the deceased had a pistol. Gatlin denied it, and the witness replied: "The man in his shirt sleeves had a pistol." The crowd then searched for, and found it. The witness did not ask Galbreath who the man was who was fighting with his coat off.

The cross-examination, though rigid and severe, failed to change the testimony of the witness in any particular, but it elicited the statement that, before the parties engaged, Bene Ellison said to the crowd: "The boys are armed, don't let them fight."

W. P. Arnold testified for the defense, and in the main described the incidents of the fight as did the other witnesses for the defense. He, however, stated positively that it was a pistol which was used by the deceased in beating the defendant over the head. He saw it distinctly, and saw that it was a large pistol. Just before the fight began, the deceased said to the defendant, "You have treated me like a dog; you have beat me over the head like a dog, and I am going to bend a pistol over your head." After the deceased had beaten the defendant to his knees, the latter said, "There, by G—d, you have cut

me." He straightened up and the shooting began. When the defendant passed the body on the way to his horse, he said: "Now, by G—d, I have done it," but the witness denied that he made the remarks imputed to him by the prosecution. The witness denied that he had ever said to Galbreath in Lockhart that if the deceased had a pistol on the morning of the killing, he, the witness, did not see it.

The pistol found on the ground after the killing was identified as a pistol at one time known to belong to Byrd Persons, and Persons, it was testified, was present at the fight.

A physician testified that, on the day after the killing, he was called in to dress a wound for the defendant. He found a gash cut in his head about an inch long. It was not of equal depth throughout its length, but in places was cut to the bone. The witness stated that it was made with some hard instrument. He did not think the barrel of a pistol would cut a similar gash, but such a gash could be cut by a protuberance on a pistol.

In rebuttal, Galbreath testified that, on the day of the killing or the day after, he had a conversation with the witness Arnold in front of Hudson's store in Lockhart, Texas, in which Arnold said that he was present at the killing and saw it all, and that the deceased had no pistol — that if he did, he, Arnold, did not see it.

Gatlin in rebuttal testified that immediately after the killing he heard Lister and Arnold disputing about a pistol, Arnold contending that the deceased had no pistol and Lister contending that he had one. Lister said that the man who had his coat off during the fight had a pistol, and asked the witness which of the boys it was.

S. A. Bruce testified, in rebuttal, that he was constable of precinct No. 2, Caldwell county, and was present at the house when the first difficulty occurred, about 11 or 12 o'clock at night. He searched the defendant at his

own request for arms, but found none. The defendant said to him: "They say I knocked Dickerson down with a pistol. I did it with this quirt; search me and see if I have a pistol." The defendant raised his coat and turned around. The witness saw no pistol, and made no closer search of the defendant. Shortly afterwards the witness saw the deceased talking to W. J. Ellison, and told him that he wanted to see him. He walked off, the deceased following some four or five feet behind. They stopped at a distance of about thirty yards, when the deceased asked the witness to search him. The witness did so, examining him closely, feeling under his coat,— and around his waist down to his hips, but found no pistol. He had no arms about him. The witness did not examine his boots.

Cross-examined, the witness stated that he did not keep his eye on the deceased while the latter was going to or from the place of search. He did not examine the ground to see if the deceased might not have dropped a pistol while following him. The deceased knew that the witness was an officer. The deceased told the witness that he would rather die than to submit to the treatment he had received that night.

Trave McFarland in rebuttal stated that he was present at a conversation between the deceased and W. J. Ellison at the well near the house. Ellison was trying to prevail upon the deceased to surrender his arms. The deceased said that he had no arms to give up. He told Ellison that as far as disarming the defendant was concerned "it was too d—d thin;" that he knew the defendant too well. On cross-examination this witness stated that the deceased told him that he was accused of having a pistol, and asked witness to search him. Witness did so, but found no arms. The defendant knew that the witness was assisting Mr. Bruce that night in keeping order.

Dick Rogers testified that W. J. Ellison gave him a

pistol for safe-keeping about one hour after dark. He returned the pistol to Ellison about 3 o'clock A. M., after the difficulty during the ball.

John and B. R. Rogers, in rebuttal, testified that it was John Rogers and not Mr. Foy who picked up the pistol on the ground near the body.

The testimony is greatly abbreviated in the foregoing statement. The opinion discloses other facts.

*Nix & Storey*, and *Sheeks & Sneed*, for the appellant: The court erred in ruling that John M. Booton was a competent juror in the case and compelling him to challenge him peremptorily. This juror had heard appellant's case talked of and discussed "a good deal" in the community and had heard versions of the killing, and had formed an impression from what he had heard as to the guilt or innocence of appellant. He was unable to say whether his impression amounted to an opinion, and was unable to distinguish between an impression and an opinion; if, upon the trial of appellant, the evidence turned out to be what he had heard it was, then his verdict would be in accordance with the impression so formed. Such was the substance of the statement of this juror when examined on his "voir dire" by counsel for appellant. He was further examined by the court, but made no material change in his statement touching his qualification as a juror. Appellant challenged him for cause, which was overruled by the court and appellant forced to peremptorily challenge him; and exception was taken. In selecting the jury appellant exhausted the twenty peremptory challenges allowed him by law. It is submitted that this juror was not competent and was subject to challenge for cause. (*Rothschild* v. *State*, 7 Texas Ct. App. 519; *Stagner* v. *State*, 9 Texas Ct. App. 444.)

1. Under the law there was secured to appellant the

right to twenty peremptory challenges in the selection of twelve jurors. This right of peremptory challenge is, and always has been considered a valuable right. The juror Dennis was the third juror selected and sworn. Appellant had used four of his peremptory challenges, when Dennis was impaneled; so a portion of his right of challenge had been exhausted in securing the services of Dennis as a juror. Before Dennis was discharged there was one juror to be obtained and appellant had two peremptory challenges remaining. After Dennis was discharged, and in consequence of his discharge, two jurors were to be selected without any increase of appellant's right of peremptory challenge. Appellant exhausted his peremptory challenges and the juror Sales was forced upon him without his consent. It is clear that the result of the action of the court in reference to Dennis, and the proceeding following in completing the jury, was practically and in effect to require appellant to select thirteen jurors for his trial and allow him but twenty peremptory challenges, thus imposing upon appellant a burden not sanctioned by law. In our view, if Dennis as a fact had become so sick as to necessitate his discharge, the effect of his discharge would be to destroy the composition of the jury and to require the discharge of all the remaining jurors and the formation of a new panel. Appellant did not consent to the discharge of Dennis, but when called upon by the court to give consent did not consent but remained silent. He therefore can avail himself of any error committed by the court, in discharging Dennis from the jury, in the same manner as if he had objected at the time. (*Early* v. *State*, 1 Texas Ct. App. 248; *Grissom* v. *State*, 4 Texas Ct. App. 374; *Hill* v. *State*, 10 Texas Ct. App. 618.)

2. If, under the law, the district judge has the authority, in the exercise of a sound discretion, to discharge a juror in a capital case from the panel after he has been

regularly impaneled and sworn and before the panel is completed, without discharging the whole number impaneled, in the case at bar such discretion was grossly abused by the court below in excusing and discharging the juror Dennis.    Appellant was entitled to the services of that juror, he being in all respects a qualified juror in the case, unless the juror after being accepted and sworn was actually rendered unable to serve, by reason of some cause, such as death or sickness, of such character as would render the juror totally unable to serve.    The court had no more authority to discharge Dennis at the time or stage of the proceeding at which he was discharged, than the court would have had to discharge him after the panel had been completed and sworn.    By article 643 of Revised Code Crim. Pro. any number of jurors less than a whole panel, after being sworn in a capital case, are placed under the same restraints as to separation as are all juries in felony cases where the panel is full and the full jury is sworn.    (In this connection see arts. 687 and 699, Code Crim. Pro.)    This article of the Code is a new provision not found in the Code prior to the revision.    By an examination of the facts connected with the ability of Dennis to serve as a juror, it will be readily seen that Dennis was not too sick to serve at the time he was excused; on the contrary, he was then able to serve and was willing to serve.    He merely had piles, which gave him pain and rendered him at that time nervous.    He was subject to piles when he took much exercise.    He then had "prolapsus ani" superinduced by the exertion of walking around with his fellow jurors in a body.    The juror thought he would be able to serve to the end of the trial if the trial did not last many days. When the judge called attention of the parties to the subject of the juror's condition, he announced that this juror was complaining of being unwell, and that, if the case proceeded with him as one of the panel, there might

be a sick juror on hand before the trial concluded and the work of trial have to be gone over again. No medical man examined the condition of the juror and gave any opinion. The character of the juror's affliction was not in its nature progressive, so as to render it at all reasonably certain or even probable that the juror would be unable to serve to the end of the trial. To come to the point directly, this juror was excused by the court because it was merely possible that the juror would not be able to serve to the end of the trial. The cause for excusing this juror was as feeble as was the cause for excusing the juror Zack Cash, in Hill's case. (*Hill* v. *State*, 10 Texas Ct. App. 618.) We refer to the able opinion in that case as being directly in point.

There is a class of cases in which the action of the trial court in permitting jurors to be removed from the panel after being accepted by both parties, and impaneled, has been sustained on appeal. But in such cases, the decisions are based on consent of parties given at the time, or on the ground that there was such disqualification in the juror as would render a verdict, in which he participated, vicious. (*Mitchell* v. *State*, 43 Texas, 512; *Evans* v. *State*, 6 Texas Ct. App. 53.) The sickness of a juror does not fall within the reason of these decisions. Sickness of a juror would not affect the validity of a verdict which he aided to make. In the case of *Ray* v. *State* (4 Texas Ct. App. 450), a juror was excused on account of sickness; which was sustained by this court. But in that case the juror was so sick as to be unable to sit in the case longer. Besides it being a necessity to discharge that juror, the statute then in force made provision for the discharge of a juror for sickness, and proceeding with the remaining jurors not less than nine in number, in the trial, etc. In that case the discretion of the judge in discharging the juror was properly and judiciously exercised. In Hill's case (10 Texas Ct. App. 618), like the one at bar, there

was a gross abuse of discretion by the trial judge. The action of the court below in the discharging Dennis from the panel was manifestly erroneous.

The court erred in excluding the evidence of the witness Joe Dillard offered to rebut the State's evidence as to declarations of deceased that he was unarmed the night before the homicide.

1. Attention is called to the charge of the court as found in the record. The first complaint which we make against the charge relates to that part of the charge defining or declaring what is implied malice as an element of murder in the second degree. After defining murder substantially in the language of the Code, the charge proceeds: "All murder committed with express malice is murder in the first degree, and all murder committed with implied malice is murder in the second degree; therefore the distinction between express and implied malice determines whether a murder is of the first or second degree." After disposing of the subject of express malice as an element of murder of the first degree and the evidences of its existence, etc., the charge proceeds to instruct the jury as to the rule by which the existence of implied malice, as an element of murder in the second degree, is ascertained and determined, in these words: "Implied malice is not, as is express malice, a fact, but is an inference or conclusion founded upon the particular facts and circumstances of the case as they are ascertained to exist, and the law implies malice from every voluntary killing of a human being where the facts and circumstances of the killing do not show upon the one hand express malice nor upon the other any justification or excuse."

Manslaughter is a voluntary killing of a human being where the facts and circumstances of the killing do not show upon the one hand express malice nor upon the other any justification or excuse. By the Criminal Code (art. 605) it is provided "that murder is distinguishable

from every other species of homicide by the absence of the circumstances which reduce the offense to negligent homicide or manslaughter, or which excuse or justify the homicide." The law does not imply malice, therefore, so as to constitute a homicide murder, unless there is absent the circumstances which reduce the homicide to negligent homicide or manslaughter or which excuse or justify the homicide. The charge of the court not only fails to follow the language of the article of the Code referred to, but it fails to use equivalent terms or language. If the proposition contained in the charge is the law, then it must be so only because the law implies malice from a voluntary homicide, though there be present the circumstances which reduce the homicide to manslaughter. According to the language and plain meaning of this charge, if the killing was voluntary and there was absent the circumstances which would excuse or justify the homicide, then the law implies that element called "malice" which distinguishes murder from all lower grades of homicide. In other words, the meaning of the charge is, that if the killing was voluntary, and if the circumstances did not show any justification or excuse, the killing would amount to murder in the second degree. According to the law, as repeatedly recognized and announced by this court, this charge is erroneous. The true rule as to the circumstances under which malice may be implied is: " That when the fact of unlawful killing is established, and there are no circumstances in evidence which may tend to establish the existence of express malice, or which may tend to *mitigate, excuse or justify* the act, then the law implies malice, and the offense is murder in the second degree." (*Harris* v. *State,* 8 Texas Ct. App. 108; *Douglass* v. *State,* Id. 529; *Hubby* v. *State,* Id. 607. That the law should have been correctly given to the jury in relation to implied malice, and as to the circumstances under which the law does imply malice, was of the greatest importance to

appellant, and under the facts of the case he was clearly entitled to have it so given.

2. We next call attention to that part of the charge which undertakes to make an application of the law to that phase of the case which would amount to murder in the second degree. It is in these words: "If you do not believe he (appellant) did so design to kill when accepting the terms of mutual combat with their fists, and the defendant did, without any formed design and sedate mind, resort to deadly weapons for the purpose of killing yet while Robert Dickerson was not himself violating the terms of the combat, then he would be guilty of murder in the second degree." This instruction is obnoxious to the objections that it charges on the weight of the evidence and assumes the existence of three of the facts upon which appellant's guilt of murder in the second degree is, by the terms of this charge, made to depend, to wit: (1) That appellant accepted the terms of mutual combat with fists. (2) That Robert Dickerson, the deceased, was not violating the terms of the combat. (3) That in the combat appellant did kill Robert Dickerson. The law is too well established to require authorities on the proposition that a charge which assumes the existence of fact, or which is on the weight of evidence, cannot stand, no matter how clearly the fact may be proven.

3. In this case appellant was entitled to a full charge on the subject of manslaughter as applicable to the facts given to the jury which the court failed to accord him. And, besides, the charge given to the jury in relation to manslaughter is erroneous. After defining manslaughter in the terms of the Code, and in a rather clumsy way defining the terms "under the immediate influence of sudden passion" and "adequate cause," the charge proceeds to give an illustration of adequate cause for passion in these words: "An assault and battery by the deceased causing pain or bloodshed is cause adequate, if producing

such a passion as defined above, to reduce the homicide to manslaughter." This, as will be seen, is not the illustration as given by the Code (art. 597). This instruction makes an assault and battery causing pain or bloodshed adequate cause for passion, on condition that passion is produced by such cause. The Code makes such assault and battery absolutely adequate cause. The existence of passion and the existence of adequate cause are distinct facts, and the existence of adequate cause is not dependent on the existence of passion. This instruction was calculated to mislead or confuse the jury.

There is one other paragraph of the charge in which the court submitted to the jury the question of manslaughter, which is in these words: "If the jury should believe that the parties did suddenly engage in a quarrel and combat in which defendant did kill Robert Dickerson, yet under such circumstances as not to be justifiable nor so as to constitute murder either in the first or second degree, then you may convict of manslaughter if the facts and circumstances so show." This charge does not submit to the jury the constituents of manslaughter so as to require the jury by their verdict to respond to their existence in the case as affirmative matter, as it should have done. But the charge adopts the singular mode of having the jury ascertain whether or not appellant was guilty of manslaughter by first determining that appellant was not justifiable, and then determining that he was not guilty of murder in the first or second degree. In other words, in order to find appellant guilty of manslaughter the jury were required by this charge to first find that he was not innocent of a culpable homicide, and then to find that he was not guilty of either degree of murder, and then find him guilty of manslaughter as a necessary consequence of the other two findings.

Besides the foregoing objections to this charge as given, we claim that the charge is also erroneous in failing to

instruct the jury as to every phase of the case as presented by the evidence. The facts of the case imperatively demanded of the court to give in charge to the jury subdivision 2 of article 597 of the Penal Code.

*H. Chilton,* Assistant Attorney General, for the State.

WILLSON, J. Appellant was indicted September 28, 1880, for the murder of Robert Dickerson. In October, 1881, he was tried upon that charge and convicted, and his punishment fixed at confinement in the penitentiary for twenty years; and from this conviction he has appealed to this court, and assigns and urges numerous errors in the proceedings of the court below, and in the conviction.

The first error assigned is the action of the court in overruling his motion for a change of venue. This motion was made and acted upon by the court in October, 1880, one year before the trial, and upon the overruling of this motion the defendant applied for and obtained a continuance of the cause. We do not think the court below abused the discretion confided to it by the law in refusing to grant the change of venue, but, even if it had, it would only be such an error as would be limited to that term of the court. The causes which might exist at one term of the court, authorizing a change of venue, might not exist at a subsequent term. If the defendant was not satisfied to be tried in Caldwell county,— if he still apprehended that he could not have a fair and impartial trial in that county,— he should have renewed his application for a change of venue, and, not having done this, he cannot be heard to complain that at a previous term of the court he had been refused a change of venue. The applicant's first three assignments of error have reference to the action of the court upon his motion asking for a change of venue, and we are of the opinion that they are not well taken.

The fourth assignment of error is that the court erred in holding that one John M. Booten was a competent juror. This juror stated that he had heard the case talked about a good deal in the community, and had heard versions of the killing, and had formed an impression from what he had heard, but had reached no conclusion in his own mind as to the guilt or innocence of the defendant; that he had a mere impression from what he had heard, but that impression would have no effect upon his verdict. He had read no published statement of the evidence; had heard none of the evidence, and had not talked to any of the witnesses. If the evidence was as he had heard of it, then he would have had an opinion; but he did not know that what he had heard was true, nor had he ever come to any conclusion that it was true. We do not think the court erred in holding this juror to be qualified. It appears from his answers, and there is nothing to contradict him, that there was not established in his mind, from hearsay or otherwise, any conclusion as to the guilt or innocence of the accused, such as would influence his verdict. Code Crim. Proc. art. 636.

The fifth, sixth, seventh, eighth and ninth assignments of error relate to the same subject, and present a question of much practical importance. After eleven jurors had been selected and sworn in the case, the court announced that one of the eleven was complaining of being unwell, and that, if the parties would consent to it, he would discharge the juror. The district attorney gave his consent to the discharge of the juror, but the defendant withheld his consent. The juror stated that he was suffering from *prolapsus ani,* to which he was subject, and which caused him much pain, — that he could serve on the jury through the trial of the case, he thought, provided the trial did not continue many days. The court thereupon, without the consent of the defendant, discharged the juror from serving in the case. The defendant excepted to this action of

the court, and presents it in a bill of exceptions. The court then proceeded with the formation of the jury, and the defendant exhausted his peremptory challenges before the panel was completed, and when the eleventh juror was again obtained, he contended that twelve jurors had been selected and impaneled in the case (including the juror who had been discharged by the court), and that the panel was full and complete. The court overruled his objections, and he excepted and presents the matter in a bill of exceptions.

Article 642 of the Code of Criminal Procedure provides: "As each juror is selected for the trial of the case the following oath shall be administered to him by the court, or under its direction,—"You solemnly swear that in the case of the State of Texas against A. B., the defendant, you will a true verdict render according to the law and the evidence, so help you God." Thus, it will be seen, each juror is sworn separately, and not all together, as was at one time the usual practice. This rule, however, applies only to the formation of the jury in a capital case. In cases less than capital the oath is administered to the jurors in a body. (Code Crim. Proc. art. 657.) When a juror in a capital case has been sworn, he is impaneled, and must remain upon the jury to the termination of the trial. There is no provision of the statute which confers upon the trial court the power to excuse a juror from service in a felony case, after he has been accepted and sworn as such. The only statutory provision we find upon this subject is article 699 of the Code of Criminal Procedure, which reads as follows: "If, after the retirement of the jury in a felony case, any one of them become so sick as to prevent the continuance of his duty, or any accident or circumstance occur to prevent their being kept together, the jury may be discharged." *Before* a juror has been accepted and sworn in a case, the court may hear an excuse from him for not serving, and may excuse him

from serving; but this provision of the law does not apply *after* the juror has been impaneled. (Code Crim. Proc. art. 620.)

It is our conclusion, and we so hold, that, after a juror has been once impaneled in a felony case, it is beyond the power of the court to excuse him from serving in the case, and that in case of sickness or accident rendering it impracticable to proceed with the trial of the case before the jury as then constituted, the court should discharge *that* jury, and proceed to form another for the trial of the case. This precise question was before this court in the case of *Hill* v. *State*, 10 Texas Ct. App. 618, and was ably discussed by Judge Hurt, and the conclusion arrived at that it was a fatal error for the court, of its own motion, to discharge a juror who had been impaneled in a case, and that it made no difference whether or not the defendant exhausted his peremptory challenges. In *Ray* v. *State*, 4 Texas Ct. App. 450, a juror was discharged by the court after being impaneled, and the verdict was found by the eleven remaining jurors; but that was under the authority of a statute (Acts 1876, p. 78, section 19) which is not now the law in felony cases. (Code Crim. Proc. art. 706.) In misdemeanor cases, however, nine jurors may render a verdict. (Code Crim. Proc. art. 707.)

The tenth assignment of error relates to the ruling of the court in rejecting certain evidence offered by the defendant. The State had proved that, on the night previous to the difficulty, the deceased was unarmed, and had proved this in part by the declarations of the deceased. It was a material question in the case, as to whether or not the deceased was armed with a pistol at the time the homicide occurred. In rebuttal of the evidence introduced by the State upon this point, the defendant offered to prove by a witness, Dillard, a conversation which he, the witness, had with deceased on the night prior to the killing in regard to deceased's having a pistol.

Upon objection made by the State, this evidence was rejected upon the grounds that it was hearsay and irrelevant. While, as a general rule, this evidence would not be admissible, yet, we think, in this case, inasmuch as the State had proved by the declarations of deceased that he was not armed with a pistol, it was competent for the defendant to rebut such declarations by the contradictory declarations of deceased showing that he was armed with a pistol. We think the court erred in rejecting the testimony offered, under the circumstances in this case.

The eleventh, twelfth, fifteenth, sixteenth and seventeenth assignments of error relate to the charge of the court. The first objection made to the charge is that it does not sufficiently or properly define and explain implied malice. The charge defines murder in the language of the statute, and then proceeds: "All murder committed with express malice is murder in the first degree, and all murder committed with implied malice is murder in the second degree; therefore the distinction between express and implied malice determines whether a murder is of the first or second degree." The charge then explains express malice and murder in the first degree, and with regard to implied malice and murder in the second degree reads as follows: " Implied malice is not, as is express malice, a fact, but is an inference or conclusion founded upon the particular facts and circumstances of the case as they are ascertained to exist; and the law implies malice from every voluntary killing of a human being when the facts and circumstances of the killing do not show upon the one hand express malice, nor upon the other any justification or excuse."

The particular objection urged to this charge is that it instructs the jury, in effect, that if the killing was voluntary it was murder, unless there were circumstances attending it which would *justify* or *excuse* the act, whereas the law is that it would not be murder if the

circumstances attending it brought it within the definition of either negligent homicide or manslaughter. This charge, standing alone, is certainly obnoxious to the objection brought against it. It excludes negligent homicide and manslaughter, and makes the homicide murder unless the attending circumstances show it to be justifiable or excusable homicide. This was of course a mere oversight in the learned judge who gave the charge, and, considering his charge in the case as a whole, a person conversant with law would not be misled by the incompleteness of the paragraph quoted, though we are not prepared to say that it was not calculated to mislead the jury. In *Sharp* v. *State*, 6 Texas Ct. App. 650, the following charge defining implied malice was approved: "Implied malice is that which the law infers from or imputes to certain acts. Thus the law implies malice from the killing of a human being, unless the circumstances make it evident that the killing was either justifiable, or, if not justifiable, was so mitigated as to reduce the offense below murder of either the first or second degree."

It is also objected to the charge that it failed to instruct the jury as to every phase of the case as presented by the evidence, in this, that the facts of the case demanded of the court to give in charge subdivision 2 of article 597 of the Penal Code, which article prescribes the "adequate causes" that will reduce a homicide to manslaughter. Subdivision 2 prescribes as an "adequate cause" "A serious personal conflict in which great injury is inflicted by the person killed, by means of weapons or other instruments of violence, or by means of great superiority of personal strength, although the person guilty of the homicide were the aggressor, provided such aggression was not made with the intent to bring on a conflict and for the purpose of killing." We think this provision of the law should have been given in charge to the jury,

under the facts of this case. It was a part of the law of the case, and the court erred in omitting to give it.

There are other objections made to the charge of the court which we do not think are well founded, nor do we think that the defendant succeeded in his effort to show that the juror Tomberlin was a prejudiced juror.

Because of the errors we have mentioned, the judgment of the court below is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*